FW 400000468

AUG 10 2026 PM2:56
FILED-USDC-NDTX-FW

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| CATHERINE CARTER, | § | |
| | § | |
| Plaintiff, | § | **4-26CV-981-0** |
| | § | |
| v. | § | CIVIL ACTION NO. _____ |
| | § | |
| | § | JURY TRIAL DEMANDED |
| CHARLES SCHWAB & CO., INC., | § | |
| | § | |
| Defendant. | § | |

### PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND

Plaintiff Catherine Carter ("Plaintiff" or "Ms. Carter") files this Original Complaint and Jury Demand against Defendant Charles Schwab & Co., Inc. ("Schwab" or "Defendant") and respectfully shows the Court as follows:

### I. INTRODUCTION

1. This action arises from Schwab's race discrimination, retaliation, and hostile work environment under Title VII and 42 U.S.C. § 1981; disability discrimination, failure to accommodate, unlawful medical inquiry, retaliation, and interference under the Americans with Disabilities Act; and constructive discharge.

2. Plaintiff is a Black woman and one of few Black employees in Schwab's Stock Plan Services Technology Division. She received "Exceeds Expectations" ratings, was selected for Schwab's Aspiring Leaders Program, and received written management praise as late as May 31, 2024. She was never placed on a performance-improvement plan or formally disciplined.

3. From October 2024 through April 1, 2025, Schwab managers opened an HR consultation concerning Plaintiff, questioned her about medical matters, downgraded her performance review during medical leave, threatened termination based on leave documentation,

and stated that she would receive performance coaching upon returning from leave. Plaintiff resigned on April 1, 2025.

## II. JURISDICTION AND VENUE

4. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under federal law: Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.; the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. § 12101 et seq.; and 42 U.S.C. § 1981.

5. Venue is proper in this District under 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Tarrant County, Texas, including where Plaintiff resided and performed remote or hybrid work during the relevant period.

6. Assignment to the Fort Worth Division is appropriate because Plaintiff resided in Fort Worth, Tarrant County, during the relevant events, performed substantial work from Tarrant County, and experienced substantial employment-related events there.

## III. PARTIES

7. Plaintiff is a Black woman. Plaintiff began performing services for Schwab on or about September 7, 2021, as a full-time contractor placed through PRO Unlimited in the role of Scrum Master–Senior. Schwab hired Plaintiff directly as a full-time employee on or about November 21, 2022, as a Manager, Scrum Master, in Stock Plan Services Technology. Plaintiff worked for Schwab until April 1, 2025.

8. Defendant Charles Schwab & Co., Inc. is a corporation organized under California law, authorized to transact business in Texas, and doing business in Texas, including at or in connection with its Westlake, Texas operations. It may be served through its registered agent, C

T Corporation System, 1999 Bryan St., Suite 900, Dallas, Texas 75201-3136, or wherever it may be found. At all relevant times, Schwab employed more than 500 employees and was an employer within the meaning of Title VII and the ADA, and is subject to liability under 42 U.S.C. § 1981.

## IV. RELEVANT NON-PARTY ACTORS

9. Jayme Conkin is a white woman who was employed by Schwab as a Director and resides in Colorado. At all relevant times, Conkin had authority over Plaintiff's reporting chain and participated in decisions or actions affecting Plaintiff's employment, including the matters alleged below. Conkin acted within the course and scope of her employment.

10. Cheryl Killette, also known as Cheryl Renee Killette and Cheryl Langley Killette, is a Black woman employed by Schwab as a Development Manager and a resident of Texas. At all relevant times, Killette reported to Conkin and was Plaintiff's direct reporting manager, empowered to take tangible employment actions affecting Plaintiff. Killette authored Plaintiff's 2024 Annual Performance Review, participated in and facilitated the adverse treatment of Plaintiff, and at all relevant times acted within the course and scope of her employment and as Schwab's agent.

11. Ramganesh Kumaraswamy, who goes by "Ram Kumar," is a Development Manager employed by Schwab and resides in Arizona. At all relevant times, Kumaraswamy reported to Conkin. In the fall of 2024, Schwab designated Kumaraswamy as team manager; he was never Plaintiff's reporting manager and held no supervisory authority over Plaintiff, per Killette. Kumaraswamy made complaints about Plaintiff that he later acknowledged were inaccurate, and coordinated with management in the conduct alleged herein. At all relevant times, Kumaraswamy acted within the course and scope of his employment and as Schwab's agent.

12. Sean Van Moorleghem is a white man who was, at all relevant times, a Managing Director at Schwab and Conkin's superior. Van Moorleghem directed the opening of a human-resources consultation against Plaintiff, added a non-performing white male employee to a title-change list, and, per Killette, was the origin of the pressure directed at Plaintiff. Van Moorleghem left Schwab and, as of approximately March 24, 2025, was employed at Cambridge Investment Research.

13. Other individuals referenced herein include: Sean Hobson (white man), a business-side manager, identified by full name throughout to distinguish him from Sean Van Moorleghem; Dennis Suppe, Managing Director (SVP); Monica Hamagami, Employee Relations; Ben Zavadil (white man), then a Product Owner Manager in Colorado, who left Schwab in April 2026 according to LinkedIn; Luke Graham, a white male Product Owner; Heera Shaik, a non-Black (Asian) female SDET/QA lead; Kevin Walters, a white male developer/technical lead; Mark Baggesen, a white male business systems analyst contractor placed through Akkodis; and Brandi Thompson, CLMS Senior Specialist in Schwab's Benefits Department.

14. Sedgwick Claims Management Services, Inc. ("Sedgwick") is a third-party claims administrator with its principal place of business in Memphis, Tennessee. At all relevant times, Sedgwick administered Schwab's employee leave and disability programs on Schwab's behalf, controlled communications regarding Plaintiff's disability claim, set documentation deadlines, and coordinated with Schwab human resources on leave administration. In administering Plaintiff's leave and the related accommodation process, Sedgwick acted as Schwab's agent within the meaning of 42 U.S.C. § 12111(5)(A), and Schwab is responsible under the ADA for Sedgwick's conduct alleged herein. Sedgwick is not named as a defendant.

## V. EXHAUSTION OF ADMINISTRATIVE REMEDIES

15. Plaintiff timely filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), Charge No. 450-2025-02911, signed January 13, 2025 and docketed January 15, 2025, asserting race discrimination and disparate treatment, retaliation, and hostile work environment under Title VII and disability discrimination under the ADA.

16. On or about May 2, 2025, Plaintiff amended and supplemented her charge through her rebuttal to Schwab's Position Statement, disclosing her April 1, 2025 resignation and constructive discharge. Plaintiff submitted additional facts to the EEOC on or about December 18, 2025, and a rebuttal to the EEOC's Preliminary Determination on May 8, 2026. Plaintiff's constructive-discharge claim grows out of, and was presented to, the administrative charge.

17. On or about May 15, 2026, the EEOC issued a Determination and Notice of Rights closing the charge administratively without any merits determination and advising Plaintiff of her right to sue. This action is filed within ninety days of Plaintiff's receipt of that notice. A true and correct copy of the Determination and Notice of Rights is attached as Exhibit A.

18. Plaintiff has satisfied all conditions precedent to suit on her Title VII and ADA claims. Plaintiff's claims under 42 U.S.C. § 1981 do not require administrative exhaustion.

## VI. FACTUAL ALLEGATIONS

### A. Plaintiff's Exemplary Record

19. In 2023, Plaintiff was rated "Exceeds Expectations" and was selected for Schwab's Aspiring Leaders Program ("ALP") in 2024, a selective leadership-development initiative. Plaintiff was never placed on a performance improvement plan and never received any formal corrective action or disciplinary write-up during her employment.

20. While performing services for Schwab from approximately 2022 through 2024, including before and after Schwab hired Plaintiff as a direct employee, Plaintiff performed additional Product Owner responsibilities as follows:

20(a). Plaintiff performed core Product Owner duties associated with Luke Graham's role while retaining her Scrum Master Manager title and compensation, and management knew she performed those duties.

20(b). Schwab's 2023 performance review rated Plaintiff "Exceeds Expectations" and recognized her Product Owner responsibilities, but Schwab did not formally assign her to a Product Owner position, change her title, or separately compensate her for those responsibilities.

20(c). Plaintiff relies on these facts as evidence of unequal work assignments and advancement opportunities, not as a claim that Schwab denied her 2023 raise or bonus.

21. On or about October 14, 2023, Plaintiff asked Killette to discuss Plaintiff's health, performance, possible layoff with severance, reduced hours or other opportunities with Schwab, and time off. Killette responded, "Hmmm . . . give me a moment." On or about October 31, 2023, Killette said she had escalated Plaintiff's concerns and that leadership was committed to improving conditions by redistributing work, supporting applications, addressing employee performance issues, and retaining Plaintiff. Schwab did not reduce Plaintiff's schedule, provide the requested time off, or offer any alternative position. Plaintiff's request was based on her health and sought changes to her working conditions, including a reduced schedule and time off.

22. On or about May 31, 2024, in a company-wide T+1 SendWord recognition thread, Sean Hobson credited Plaintiff with running the cross-organization T+1 huddles. Conkin praised Plaintiff's "partnership, allyship, and organization force," and Van Moorleghem added praise and encouragement.

**B. Plaintiff's Disability and Schwab's Knowledge**

23. Plaintiff had a disability within the meaning of the Americans with Disabilities Act that substantially limited one or more major life activities.

24. Plaintiff's disability and related limitations were documented by her treating providers and disclosed to Schwab and Sedgwick through medical documentation and communications concerning Plaintiff's leave and accommodation requests.

25. On or about May 1, 2024, Plaintiff's primary-care provider recommended a balanced work environment and that Plaintiff not be overloaded with additional employee responsibilities. The recommendation followed Plaintiff's increased work-related symptoms and supported her request that Schwab not require her to continue performing additional Product Owner responsibilities. Schwab did not reassign those responsibilities.

26. Plaintiff received treatment for her impairments, and her symptoms intensified during 2024 and continued after her leave began. Plaintiff required leave and treatment because of the severity of those symptoms.

27. Schwab's conduct caused or worsened Plaintiff's emotional distress and related impairment. Those symptoms continued during 2025 and remained ongoing thereafter.

28. Schwab knew of Plaintiff's medical condition and disability through her requests for medical leave, medical documentation provided to Sedgwick, her communications with Employee Relations, and Conkin's own October 21, 2024 questioning of Plaintiff regarding the nature and timing of her condition, alleged below.

29. Plaintiff's provider recommended that she walk the Westlake campus. Plaintiff provided that recommendation to Killette, and Killette approved a worksite or hoteling

arrangement, telling Plaintiff in substance that she could sit anywhere so long as she scanned her badge.

## C. Comparator Evidence

30. Plaintiff relies on the following employees as comparators, limited comparators, and background or mosaic evidence concerning how Schwab treated employees in similar or different circumstances. For each employee, Plaintiff identifies, where known, the relevant manager, employment role, performance or leave circumstance, action taken by Schwab, and relationship to the treatment Plaintiff received. Plaintiff relies on these circumstances collectively, including as part of a mosaic of evidence supporting her claims.

31. Heera Shaik was a non-Black SDET/QA lead who reported to Killette — the same manager and decision-makers as Plaintiff. Killette knew Shaik was underperforming: on or about October 27, 2023, in Microsoft Teams messages, Killette told Plaintiff that Shaik "toots her own horn," overstated her contributions, and that other SDET/QA leads had repeatedly reported the same concerns, which Killette said she "already knew." Killette also stated that Conkin appeared to favor Shaik. Despite this knowledge, Killette converted Shaik from contractor to full-time employee, provided a requested start incentive, and Shaik continued to receive a salary and annual bonuses. Killette never enforced performance standards against Shaik. A team member reported to Plaintiff that Shaik attached her own name to the team member's work in Jira. When Plaintiff, based on data, reported to Killette that Shaik was not performing, Killette again responded that she already knew — yet took no corrective action. Shaik operated without consequence.

31(a) When Plaintiff corrected Shaik on a team call regarding Shaik's responsibilities, Killette and Conkin sided with Shaik. On or about October 23, 2024, Killette sent Plaintiff a text

stating: "I see, so I have a question. Are you saying that people who don't work honestly should be shunned or disrespected?" — characterizing Plaintiff's good-faith correction of an underperforming employee as misconduct.

32. Kevin Walters. Walters, a white male who reported to Killette — the same management chain and decision-makers as Plaintiff — received title advancement despite known deficiencies. On or about August 1, 2023, when performance concerns were raised regarding Walters, Killette stated the concerns would "go on deaf ears." On or about July 29, 2024, Killette told Plaintiff via Microsoft Teams that HR had circulated a list and Van Moorleghem added Walters's name to it to obtain a job-title change to "Architect" — enhancing the marketability and profile of an employee whose non-performance Killette had acknowledged. Walters was never subjected to an HR consultation, escalated coaching, discipline, or constructive discharge.

33. Luke Graham was a white male Product Owner who worked in a different reporting structure. Plaintiff performed core Product Owner duties associated with Graham's role for an extended period while retaining her Scrum Master Manager title and compensation. Management knew that Plaintiff performed those duties.

34. In or about November 2023, James Royer, Kiran's manager, scheduled a meeting with Plaintiff to discuss how Royer should manage Kiran. Kiran was an Indian male Scrum Master whose work performance management considered deficient; Royer sought Plaintiff's input because leadership wanted Kiran "to be more like" Plaintiff. Kiran was not subjected to an HR consultation, downgraded review, termination threat, or directive to leave based on the performance concerns for which Plaintiff was asked to coach him. Plaintiff and Kiran performed substantially similar Scrum Master work and were evaluated within the same management organization.

35. Mark Baggesen, a white male business systems analyst contractor placed through Akkodis, reported to Killette on the Schwab side while also having an Akkodis-side manager. In 2024, Schwab granted Baggesen a schedule accommodation for family caregiving, reducing his schedule from Monday through Friday to Monday through Thursday, while Plaintiff's work-from-home request was denied.

35(a). Plaintiff prepared recurring team-status reports for approximately two years, including through part of 2024. The reports required information from Baggesen, Graham, and other team members, with each person responsible for a portion. When requested information was late or unavailable after Plaintiff contacted the responsible person by email or Microsoft Teams, Plaintiff stopped completing portions assigned to others. The 2024 Annual Performance Review nevertheless identified Plaintiff's difficulty obtaining information from the Product Owner and BSA as a development concern.

36. "Brad." In or about November 2023, Brad, a white male Product Owner assigned to a different team, who reported through the product-side organization rather than through Plaintiff's reporting chain, informed Schwab that he intended to resign in order to care for a seriously ill parent. Rather than accept his resignation, management informed Brad of his leave rights under the Family and Medical Leave Act and facilitated his use of leave; Brad remained employed and took time off as needed. Weeks earlier, Plaintiff had raised her own health, reduced hours or other opportunities, and time off with her manager, as alleged in Paragraph 21. Schwab did not facilitate leave, provide accommodation, or offer an alternative.

37. The Schwab managers involved in Plaintiff's treatment knew of the circumstances involving Shaik, Walters, Graham, Kiran, Baggesen, and Brad when those circumstances were addressed.

38. Schwab responded to those employees' circumstances by converting employment status, pursuing a title change, retaining or coaching employees, adjusting assignments, granting a schedule change, or facilitating leave.

39. Schwab instead opened an HR consultation concerning Plaintiff, downgraded her performance rating, questioned her medical leave, and required her to address concerns involving Kumaraswamy.

**D. April–September 2024**

40. On or about April 15, 2024, Killette criticized Plaintiff's relationships, team-player status, and meeting attendance, including attendance at a Scrum-of-Scrums meeting for which Plaintiff was not the designated delegate.

41. Beginning earlier in 2024 and again in September and October 2024, Killette repeatedly pressed Plaintiff to attend an in-person "pizza lunch," raising her attendance as an engagement complaint on multiple occasions although the event was a non-mandatory social function. Killette relayed to Plaintiff that Van Moorleghem wanted "butts in the seat." The pressure was recurring and cumulative. Plaintiff took vacation approved by Killette through Workday; her approved absence was then used against her, with Killette telling Kumaraswamy and Conkin — both of whom worked remotely from Arizona and Colorado and had no independent knowledge of Plaintiff's presence — that Plaintiff was "not there." Plaintiff's purported non-attendance at optional functions was among the grounds management subsequently invoked in the HR consultation and the 2024 Annual Performance Review.

42. On or about September 8, 2024, Plaintiff requested a meeting agenda for a September 13, 2024 meeting, consistent with Schwab meeting practices. Kumaraswamy escalated that

routine request to leadership — Van Moorleghem and Conkin. Plaintiff learned of the escalation only because Killette told her.

43. On or about September 13, 2024, during a meet-and-greet call with Kumaraswamy — who had been designated team manager while Killette remained Plaintiff's reporting manager — Plaintiff directly and professionally raised the three concerns Kumaraswamy had voiced about her; he apologized to Plaintiff twice and acknowledged the issues. Plaintiff engaged Kumaraswamy in good faith rather than avoiding him.

44. During a call on or about September 17, 2024, Plaintiff told Kumaraswamy he could not escalate about her two levels up after having apologized the prior week, noting that his influence as a manager "matters." Kumaraswamy responded that he wanted her to "be frank" and "ask tough questions," apologized again. Plaintiff reported that Shaik was not completing assigned work despite Plaintiff's prior reports without corrective action and stated that some employees appeared to have immunity. Kumaraswamy said that he knew what Plaintiff meant and agreed. Plaintiff then raised concerns about Kevin Walters. Kumaraswamy also stated, "I have raised and got bitten by that."

**E. October 2024**

45. On or about October 2, 2024, Killette warned Plaintiff that Kumaraswamy was "one of those people who could mess up stuff" and that she did not want anything to happen where Plaintiff was "not in good standing." Killette also stated that Kumaraswamy could "cause people's careers to be messed up." Killette told Plaintiff that Kumaraswamy had escalated complaints about her to leaders above Killette.

46. During a 2024 Agile team meeting, possibly a retrospective, Kumaraswamy criticized Plaintiff's performance and stated, in substance, that Plaintiff was taking the team backward. Plaintiff understood the statement as criticism of her work as Scrum Master.

47. On or about October 2, 2024, Graham — a Product Owner with no stake in any management dispute — told Plaintiff, in substance, that he did not know why management had it out for her. Graham had worked in the same broader organization and was familiar with the management conduct at issue.

48. On or about October 7, 2024, during Day 1 of PI Planning, Plaintiff corrected Conkin on a matter relating to MRA, having obtained clarification from the enterprise program manager. Conkin responded negatively to the correction. Immediately following the breakout session, Plaintiff reported to Killette that she needed assistance with Conkin and provided Killette with screenshots documenting the MRA matter. Killette acknowledged that she herself experienced difficulty with Conkin's communication.

49. On or about October 8, 2024, Ben Zavadil, a product-side manager, sent Plaintiff a Microsoft Teams message stating: "I am being told that Jayme had to come in and basically save the breakout session?" Zavadil further stated that Jayme had gone to Andrew Macris, a Director who supervised Zavadil and Graham, and told him that she had come in and rescued the breakout session. Plaintiff understood those statements to concern the October 7 breakout session, which Plaintiff had led. Zavadil also described concerns about Conkin's treatment of him.

50. On or about October 21, 2024, Plaintiff asked Conkin for examples supporting the characterization that Plaintiff was "resentful and combative." Conkin referred to statements from Killette and Kumaraswamy concerning Plaintiff's participation in one-on-one meetings and

stated that she had asked Kumaraswamy to assess whether team members were contributing at a high level.

51. On October 9, 2024, two days after Plaintiff corrected Conkin during Day 1 of PI Planning, Conkin held a meeting with Plaintiff concerning "Manager Transition Feedback, Availability Concerns, Engagement – 1:1 with leaders." Conkin stated that Plaintiff had no engagement issues with her team, described Plaintiff as receptive and having mutual respect with the team, and said that Plaintiff's engagement should also extend to leadership groups. Conkin referred to Plaintiff's attendance and participation in meetings with senior leader Dennis Suppe, Managing Director (SVP), who visited the Southlake campus for pizza, and to Plaintiff's one-on-one meetings with managers. Conkin stated that Plaintiff's calendar appeared visibly open and characterized the issue as "a modest training issue" and not a big deal. Conkin also stated that Luke Graham was challenging because he did not engage with his team to the degree management wanted and described him as a "wild card."

51(a). Killette's Outlook invitation for one-on-one meetings stated, "Please feel free to cancel if you feel that a meeting is not needed." Conkin likewise communicated to the organization that she encouraged autonomy, including that employees could cancel meetings they did not need. Consistent with those statements, Plaintiff periodically cancelled individual one-on-one meetings with Killette and with Conkin over a period of years, and on numerous occasions advised that the meeting could be kept if the manager had anything to discuss. Neither Killette nor Conkin objected to those cancellations or identified them as a performance concern at the time.

52. During the October 9, 2024 call, Plaintiff reported to Conkin that Kumaraswamy managed from "a position of fear and even intimidation," had directed offshore personnel not to

escalate issues to Schwab employees, and had conveyed different information to leadership than he had conveyed to Plaintiff. Plaintiff also stated that she did not feel comfortable meeting with Kumaraswamy alone and requested that future discussions include another manager or employee.

53. On or about October 15, 2024, Graham told Plaintiff that Kumaraswamy was "trying to change everything."

54. On or about October 18, 2024, on a Microsoft Teams video call with both participants on camera, Dennis Suppe, Managing Director (SVP), acknowledged "red flags" regarding the situation, stated the behavior was "not acceptable," confirmed the in-person functions at issue were optional, and questioned why the matter was being raised at all, asking in substance where Plaintiff's manager was in all of this. No corrective action followed.

55. On October 21, 2024 — twelve days after Plaintiff's October 9 report — Conkin stated that the MRA issue "blew up last week," referring to the October 7, 2024 PI Planning session. Conkin stated that Plaintiff's conduct was perceived as "very undermining" and as "trying to stir a pot," characterized Plaintiff's refusal to create a Jira board as "bold" and "not a good strategy," stated that avoiding one-on-one meetings with people leaders would make matters "worse and harder," and told Plaintiff that she was "being viewed as a bit of a problem."

56. Conkin told Plaintiff that she needed to work closely with Kumaraswamy and attend one-on-one meetings with him. Conkin stated, "Focus on working with Ram, right? That's not going to go away, not unless, you know, it really gets to a point where it's just not conducive and healthy for anybody." Conkin also stated that Kumaraswamy was "not your direct people leader. But I'm hoping we don't get to that point for you or for us on any side of the equation." Conkin further stated, "All these things going on are . . . I feel like they're kind of pushing you out and I

don't want that but I got to know where you're at." Plaintiff understood these statements, in their context, as conveying that continued employment was conditioned on complying with Conkin's direction to work with Kumaraswamy and abandoning objections to his conduct, with separation from Schwab possible if Plaintiff did not comply.

57. Conkin told Plaintiff, "I think you don't like this job," and that it "might not be a good fit for you, whether it's the team or the management style or stock plan or whatever." Conkin also stated, "Until you move on, you got to do the job." Conkin also stated "I know Luke has been a struggle." In context, Plaintiff understood these statements, together with those alleged in Paragraph 56, as warning that her employment could be jeopardized if she did not comply.

58. During the same call, Conkin questioned the timing of Plaintiff's requested leave, stating that it "feels weird" and asking whether the leave concerned "more of that stomach and heart stuff" or something else, and whether it involved mental or physical health. In discussing Plaintiff's previously approved worksite or hoteling accommodation at the Westlake campus, Conkin stated, "Nobody's holding it against you up until now. But going forward, you've got to get over that hump."

59. On or about October 22, 2024, Killette texted Plaintiff confirming that an HR consultation had been opened on Plaintiff: Kumaraswamy had escalated to Van Moorleghem, who directed — per Killette, was "adamant" — that Conkin handle the situation, "hence why she has me opening the consultation"; Killette added that Conkin "really wants you to stay." On or about the same date, from her personal cell phone, Killette texted Plaintiff to "play the game" and to "find an alternative."

60. In an October 2024 Microsoft Teams message, Killette told Plaintiff that Conkin's "fire was initiated by Sean," that Van Moorleghem was "on her and demanding," and that the pressure could affect Killette's rating. Plaintiff alleges that this message describes pressure from Van Moorleghem through Conkin and Killette concerning the actions taken against Plaintiff.

61. On or about October 24, 2024, during a call attended by Plaintiff, Kumaraswamy, and Killette as a witness, Kumaraswamy admitted that he had not told leadership Plaintiff refused to create the Jira board. Killette then apologized on behalf of leadership and stated that she took responsibility for the situation. Plaintiff told Kumaraswamy that he had created an environment that was not good for her to work in. Kumaraswamy was not Plaintiff's direct manager; Killette was. Schwab nevertheless proceeded with the HR consultation and subsequent performance-review actions.

62. On or about October 28, 2024, Plaintiff began medical leave, administered by Sedgwick.

**F. November 2024–March 2025: The Leave Period**

63. On or about November 1, 2024, Killette texted Plaintiff that she had "failed [her] as a manager" after witnessing her health deterioration.

64. On or about December 31, 2024, Plaintiff told Employee Relations representative Monica Hamagami that Schwab had subjected her to disparate treatment and that employees had made false statements about her. Plaintiff identified Kumaraswamy, Conkin, Walters, Shaik, and Graham and reported that they had not been subjected to the HR consultation, threats, or treatment directed at Plaintiff. Plaintiff described concerns about Kumaraswamy's management of the OGA project and stated that he had remained employed and received additional authority while Plaintiff faced escalating scrutiny. Plaintiff also told Hamagami that the October 9 and

October 21 events had been arranged or used as part of an effort to remove her and that she considered the HR consultation retaliation. Plaintiff reported more favorable treatment of non-Black employees and referenced Killette's statement about a "good old boys club."

65. Hamagami documented Plaintiff's complaint as involving abuse, hostility, retaliation, defamation, unequal treatment, intimidation, and threats. Plaintiff later left a voicemail identifying the alleged false Jira-board accusation and stating that Kumaraswamy had denied making the report.

66. Before Plaintiff resigned, Schwab did not provide Plaintiff with investigation findings concerning the managers identified in her December 31 complaint. Schwab did not inform Plaintiff that it had disciplined Kumaraswamy, Conkin, or Killette concerning the matters Plaintiff reported.

67. On or about January 13, 2025, Plaintiff signed EEOC Charge No. 450-2025-02911, docketed January 15, 2025.

68. On or about February 3, 2025, Killette submitted Plaintiff's Manager Evaluation in Workday. Plaintiff's rating declined from "Exceeds Expectations" in 2023 to "Met Expectations" for 2024. The review described Plaintiff as a highly effective Scrum Master, credited her with successful project delivery, positive stakeholder feedback, strong team dynamics, and protecting the team's time, and identified no specific date, incident, project, or example supporting its criticisms. Schwab awarded Plaintiff a merit increase during the same review cycle. The review stated, "Despite . . . the fact that she had to take a leave of absence . . . Catherine met expectations," and directed Plaintiff to "target more frequent in-person collaboration by gradually increasing time in main work area," which Plaintiff understood to conflict with her approved worksite accommodation. The review identified "Building Relationships,"

"particularly with the new manager, Ram, given past concerns," as a development area, although Plaintiff had reported concerns about Kumaraswamy's conduct and he had acknowledged that information previously provided about Plaintiff was inaccurate. The review also stated that Plaintiff faced challenges obtaining necessary information from the Product Owner and BSA and suggested improvement in influencing and collaborating with those roles. Plaintiff had reported to management that difficulties obtaining metric information and pressure involving offshore personnel impeded the team's work. Plaintiff contends that identifying and escalating impediments and protecting the team's effectiveness were responsibilities of her Scrum Master role.

69. The three Areas for Development in the 2024 Annual Performance Review correspond directly, and in the same order, to the three subjects of Conkin's October 9, 2024 meeting agenda — set approximately two days after Plaintiff corrected Conkin, and on the same call on which Conkin stated there were no engagement issues: (1) "Building Relationships ... particularly with the new manager, Ram" (Manager Transition Feedback); (2) "Strive to attend weekly 1:1s with the appropriate managers" (Availability Concerns); (3) "Leadership Engagement: Constructive & Respectful feedback loops with leaders" (Engagement – 1:1 with leaders). Conkin's October 9 statements that Plaintiff was receptive, had mutual respect with her team, and had no engagement issues contrasted with the later review's identification of "Building Relationships," particularly with Kumaraswamy, as a development area.

70. Plaintiff does not yet know which manager supplied the negative input incorporated into the review. The October 9 agenda identified the same three subjects later appearing as the 2024 Annual Performance Review development areas; the review specifically referred to Plaintiff's relationship with Kumaraswamy; and the review was advanced while Plaintiff was on

leave. These facts support an inference that Conkin, Kumaraswamy, or both supplied or influenced the negative input.

71. On or about February 11, 2025, Sedgwick sent the provider-statement deadline notice to Killette rather than to Plaintiff, and Killette did not inform Plaintiff. Sedgwick also gave Plaintiff's physician less than three weeks to respond. Plaintiff's treating therapist complained about the shortened deadline. Plaintiff raised the issue in her March 3, 2025 written appeal to Sedgwick and reported it to Brandi Thompson, Monica Hamagami, and Cindy, a Schwab Human Resources representative, who responded by email under the Schwab Human Resources case number identified in Paragraph 77(a). Schwab did not correct the problem before Plaintiff resigned.

72. On or about February 12, 2025, per the Workday Process History, the "Approval by Manager's Manager" step of the review was recorded as "Manually Advanced" by Poojitha Nathi, listed "For: Jayme Conkin" — while Plaintiff was marked "On Leave."

73. On or about February 24, 2025, Killette released the review to Plaintiff during her medical leave. The lowered rating was locked in before the company-wide March bonus payout. A base compensation increase took effect the same date (per Schwab's Position Statement); Plaintiff was not informed of the raise before it processed.

74. On or about February 25, 2025, Plaintiff received an email and letter from Schwab CLMS Senior Specialist Brandi Thompson stating that Schwab would terminate Plaintiff's employment immediately if documentation was not received by March 4, 2025.

74(a). On or about February 25, 2025, Plaintiff replied to Thompson, copied Monica Hamagami, and reported Schwab's and Sedgwick's handling of the provider-statement requirement and related leave-documentation problems.

75. On or about February 27, 2025, despite Plaintiff's request that communications proceed through Employee Relations or Human Resources, Killette sent Plaintiff an unsolicited text stating that it appeared Plaintiff had "moved on from Charles Schwab," that Plaintiff's manager had obtained a 117% bonus allocation for Plaintiff, and that Killette was saddened Plaintiff viewed her as an enemy. Plaintiff understood the message to indicate that Schwab expected Plaintiff to leave. The message caused Plaintiff emotional distress.

76. On or about March 3, 2025, Plaintiff submitted a written appeal to Sedgwick documenting the misdirected February 11 notice, confirming that her correct email address had always been on file, and detailing her attempts to comply through the portal, by phone, and by email despite system-access failures.

77. On or about March 7, 2025, Schwab, through counsel, submitted a Position Statement to the EEOC. Schwab stated that Plaintiff had not suffered an adverse employment action, that she would receive performance coaching after returning from medical leave, and that Sedgwick — not Schwab — managed her leave. Schwab stated that Sedgwick, "and not Charles Schwab, manages leaves of absences and short term disability claims," and that neither Killette nor Conkin was involved in the management of the leave.

77(a). Separately, on or about March 7, 2025, Plaintiff contacted Schwab Human Resources and spoke with a Schwab Human Resources representative, who stated that she would share Plaintiff's feedback with Schwab's Leave of Absence team, which coordinates such matters, and with leadership. Schwab thereafter corresponded with Plaintiff under Human Resources Case No. HRC1205631. The case closed on or about April 4, 2025, three days after Plaintiff resigned, without Schwab providing Plaintiff any findings concerning the matters she reported.

78. On or about March 16, 2025, Cindy, a Schwab Human Resources representative, wrote to Plaintiff through Schwab's MyHR ServiceNow system: "I have reached out to Sedgwick for a review [of] your leave of absence claim and concerns." The message was signed, "Sincerely, Cindy."

79. On or about March 17, 2025, in a written report to Schwab HR (Brandi Thompson, copy to Monica Hamagami), Plaintiff documented that her email address had been altered without authorization in Sedgwick's system, blocking her from receiving critical leave communications, including the approval letter — resolved only after she identified and reported it. Plaintiff also reported the Sedgwick nurse's failure to return her provider's calls, unreasonable same-day documentation demands, and instructions not to contact her own medical team.

80. During Plaintiff's leave, a Sedgwick representative stated that extended absences generally should show improvement over time and suggested that treatment could progress toward more intensive care. Plaintiff's treating provider's assessment did not support that characterization. On or about March 31, 2025, Sedgwick requested additional information that only Plaintiff's physician could provide, although the physician had submitted paperwork on or about March 27, 2025. Plaintiff called Sedgwick on March 31 and responded through its portal on April 1, stating that she would discuss the questions with Dr. Tomlinson and that the nature and specificity of the questions appeared to pressure her to return to work.

80(a). On April 1, 2025, Plaintiff reported through Schwab's Human Resources portal that Killette had contacted her despite Plaintiff's February 26 request that communications proceed through Employee Relations or Human Resources. Plaintiff also reported Sedgwick's handling of her short-term-disability extension and conflicting return-to-work dates of April 1 and April 2, 2025, and attached her resignation letter.

80(b). Sedgwick approved Plaintiff's short-term-disability extension shortly afterward, including an approval issued on April 2, 2025, covering April 2 through April 7, 2025.

## G. Constructive Discharge

81. On April 1, 2025, Plaintiff resigned effective immediately by email. Plaintiff stated that ongoing hostile work environment, discriminatory treatment, and retaliation had significantly affected her health and well-being. Plaintiff returned company property to the DFW3 security desk that day.

82. On or about April 2, 2025, Sedgwick approved Plaintiff's short-term-disability based on documentation submitted by Plaintiff's physician on or about March 27, 2025.

83. The conduct involved Kumaraswamy's accusations, Van Moorleghem's direction, Conkin's statements concerning Plaintiff's continued employment and medical leave, Killette's opening of the HR consultation, the downgraded review, and the leave-related pressure described above.

84. The cumulative conduct described above made Plaintiff's working conditions so intolerable that a reasonable person in her position would feel compelled to resign. Plaintiff resigned on April 1, 2025.

## VII. CAUSES OF ACTION

## COUNT I — TITLE VII RACE DISCRIMINATION

85. Plaintiff realleges and incorporates by reference paragraphs 1 through 84 as though fully set forth herein.

86. Plaintiff was qualified for her position and performed her duties satisfactorily. Schwab's treatment of Plaintiff, including the adverse actions alleged above, was because of her race.

87. Plaintiff performed Product Owner responsibilities associated with Graham's role for an extended period while Schwab retained her in the Scrum Master Manager position and paid her under that position's compensation structure. Plaintiff alleges that Schwab's assignment of those responsibilities and failure to provide corresponding title, advancement, or compensation opportunities were part of the unequal treatment alleged in this Complaint. Plaintiff does not contend that Schwab's 2023 merit increase or bonus was unlawfully denied.

88. These differences in treatment, considered with the other facts alleged, support an inference that Schwab treated Plaintiff less favorably because she is Black. Plaintiff's race was a motivating factor in Schwab's conduct, which caused the damages alleged below.

## COUNT II — TITLE VII RETALIATION

89. Plaintiff realleges and incorporates by reference paragraphs 1 through 84 as though fully set forth herein.

90. Plaintiff engaged in protected activity on December 31, 2024, when she reported race-based disparate treatment and identified non-Black employees who received more favorable treatment. Plaintiff also engaged in protected activity by filing her January 2025 EEOC charge. Plaintiff relies on the October 9 report as background and does not allege that report, standing alone, was opposition to race discrimination.

91. Schwab subjected Plaintiff to materially adverse actions after her December 31, 2024 race-discrimination complaint and January 2025 EEOC charge, including the downgraded

performance review, the February 25 termination threat, announced return-to-work coaching, and constructive discharge.

92. The October 21 threats and October 22 HR consultation followed Plaintiff's October 9 report by approximately twelve days and provide background and notice concerning Schwab's subsequent conduct. The downgraded review, termination threat, announced return-to-work coaching, and constructive discharge followed Plaintiff's December 31 race-discrimination complaint and January 2025 EEOC charge. The timing, sequence, and stated reasons support an inference that Plaintiff's December 31 complaint and EEOC charge were but-for causes of the later retaliatory actions.

93. Schwab did not provide Plaintiff with investigation findings concerning the managers identified in her December 31 complaint and instead continued taking adverse action against Plaintiff.

94. Plaintiff's protected activity was a but-for cause of Schwab's retaliatory actions, which caused the damages alleged below.

## COUNT III — TITLE VII HOSTILE WORK ENVIRONMENT

95. Plaintiff realleges and incorporates by reference paragraphs 1 through 84 as though fully set forth herein.

96. Schwab subjected Plaintiff to unwelcome conduct because of her race, including unequal treatment, escalated complaints, threats concerning her employment, adverse performance treatment, and pressure involving Kumaraswamy. The conduct occurred over an extended period, involved multiple Schwab managers, and was sufficiently severe or pervasive that it altered the terms and conditions of Plaintiff's employment.

97. Schwab knew of the conduct through Plaintiff's October 9, 2024 report, December 31, 2024 race-discrimination complaint, January 2025 EEOC charge, and the managers' own participation in or knowledge of the conduct. Schwab did not take prompt and effective corrective action.

98. The alleged conduct caused or worsened Plaintiff's emotional distress, anxiety, panic symptoms, sleep disruption, and related impairment; contributed to conditions that compelled her resignation; and caused economic and noneconomic damages.

## COUNT IV — ADA DISABILITY DISCRIMINATION AND FAILURE TO ACCOMMODATE

99. Plaintiff realleges and incorporates by reference paragraphs 1 through 84 as though fully set forth herein.

100. Plaintiff was an individual with a disability within the meaning of the Americans with Disabilities Act and was a qualified individual who could perform the essential functions of her position, with or without reasonable accommodation, through her last day of employment.

101. Plaintiff requested reasonable accommodations beginning in or about October 2023, as alleged in Paragraph 21, and continuing thereafter, including the worksite or hoteling arrangement, restriction from performing Graham's Product Owner duties pursuant to her provider's May 1, 2024 recommendation, and medical leave. Schwab knew of Plaintiff's disability and related limitations from October 2023 forward, as alleged in Paragraphs 21, 23 through 29, and 58, and continued to receive information concerning them through the medical documentation supporting her leave. Schwab handled the approved worksite or hoteling arrangement through its management chain, while Schwab later described leave administration as a matter managed by Sedgwick.

102. Plaintiff requested reasonable accommodations, including medical leave, the approved worksite or hoteling arrangement, and restriction from performing Graham's Product Owner duties pursuant to her provider's May 1, 2024 recommendation. Schwab did not reassign the restricted duties, pressured Plaintiff on October 21, 2024 to increase her in-person presence despite the approved worksite accommodation, and later directed her through the 2024 Annual Performance Review to increase time in the main work area while expressly weighing her medical leave against her.

103. During Plaintiff's leave, Sedgwick administered the leave and accommodation process on Schwab's behalf. Sedgwick misdirected provider notices, altered Plaintiff's contact information, shortened documentation deadlines, failed to relay or obtain provider communications, imposed additional documentation demands, questioned the length of Plaintiff's leave, and pressured her regarding a return to work. Schwab learned of these problems through the communications alleged in paragraphs 71, 74(a), 76, 77(a), 78, and 79. Plaintiff also reported related concerns to Sedgwick through her written appeal and other communications. Schwab did not correct the problems before Plaintiff resigned. The detailed facts concerning Plaintiff's leave, accommodation-related communications, Sedgwick's administration, Schwab's knowledge, and resulting harm are alleged in Paragraphs 71 through 84.

104. Schwab's conduct substantially contributed to conditions that a reasonable person would have found intolerable, and Plaintiff resigned on April 1, 2025. Plaintiff suffered the damages alleged below.

## COUNT V — UNLAWFUL MEDICAL INQUIRY IN VIOLATION OF 42 U.S.C. § 12112(d)(4)(A)

105. Plaintiff realleges and incorporates by reference paragraphs 1 through 84 as though fully set forth herein.

106. On or about October 21, 2024, during a call, Conkin questioned the timing of Plaintiff's requested leave, stating that it "feels weird" and asking whether the leave concerned "more of that stomach and heart stuff" or something else. Conkin then asked whether it involved mental or physical health, including whether Plaintiff needed "to take space and time away" or needed time to recover from procedures. Conkin stated that she was not questioning Plaintiff's doctor's request and that she supported Plaintiff taking leave.

107. The inquiries were made by a Schwab Director acting within the scope of her employment. The inquiries violated 42 U.S.C. § 12112(d)(4)(A) and caused Plaintiff emotional distress and other damages recoverable under the ADA.

## COUNT VI — ADA RETALIATION IN VIOLATION OF 42 U.S.C. § 12203

108. Plaintiff realleges and incorporates by reference paragraphs 1 through 84 as though fully set forth herein.

109. Plaintiff engaged in protected activity by requesting disability-related accommodations, disclosing her medical restrictions, requesting and taking medical leave, reporting Schwab's interference with her leave and accommodation process, and asserting ADA violations in her EEOC charge.

110. Schwab knew of Plaintiff's protected activity through her communications with Killette, Conkin, Employee Relations, Sedgwick, and the EEOC.

111. After Plaintiff engaged in that protected activity, Schwab subjected her to materially adverse actions, including pressure to abandon her approved worksite accommodation, the downgraded performance review, the directive to increase in-person attendance, the February 25,

2025 termination threat during leave, the announced return-to-work coaching, and constructive discharge.

112. The timing and sequence of these actions, including the review submitted during Plaintiff's leave and the termination threat during that leave, support an inference that Plaintiff's protected activity was a but-for cause of the retaliation.

113. As a result, Plaintiff suffered the damages set forth below.

## COUNT VII — ADA INTERFERENCE AND COERCION

114. Plaintiff realleges and incorporates by reference paragraphs 1 through 84 as though fully set forth herein.

115. Plaintiff exercised or sought to exercise rights protected by the ADA, including the right to request reasonable accommodation, take disability-related leave, and participate in the accommodation and leave processes.

116. Schwab, directly and through Sedgwick, interfered with, coerced, intimidated, or threatened Plaintiff in the exercise of those rights by:

    a. pressuring Plaintiff to abandon her approved Westlake worksite accommodation;

    b. counting her medical leave against her in the 2024 Annual Performance Review;

    c. directing her to increase in-person attendance contrary to the approved accommodation;

    d. threatening termination during her medical leave;

    e. requiring return-to-work "coaching" based on alleged performance concerns that included her leave; and

    f. misdirecting leave notices, altering her contact information, shortening documentation deadlines, and imposing additional demands through Sedgwick.

Schwab engaged in the conduct alleged in this paragraph because Plaintiff exercised or sought to exercise rights protected by the ADA. But for Plaintiff's exercise or attempted exercise of those rights, Schwab would not have engaged in that conduct.

117. Schwab knew of these circumstances through the communications alleged in paragraphs 71, 74(a), 76, 77(a), 78, and 79, and through Plaintiff's written appeal and other communications to Sedgwick. Schwab did not correct the problems before Plaintiff resigned.

118. The interference and coercion substantially contributed to Plaintiff's constructive discharge and caused the damages set forth below.

## COUNT VIII — RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981

119. Plaintiff realleges and incorporates by reference paragraphs 1 through 84 as though fully set forth herein.

120. Schwab discriminated against Plaintiff because of her race in the making, performance, and termination of her employment contract, including through the discriminatory conduct and adverse employment actions alleged above.

121. These differences in treatment, considered with the other facts alleged, support an inference that Schwab treated Plaintiff less favorably because she is Black. Plaintiff's race was a but-for cause of Schwab's discriminatory conduct, including conduct affecting the making, performance, and termination of her employment contract, which caused the damages alleged below.

## COUNT IX — RETALIATION IN VIOLATION OF 42 U.S.C. § 1981

122. Plaintiff realleges and incorporates by reference paragraphs 1 through 84 as though fully set forth herein.

123. Plaintiff opposed race-based disparate treatment through the December 31, 2024 complaint described in paragraph 64 and through her January 2025 EEOC charge.

124. After Plaintiff opposed race discrimination, Schwab downgraded her performance review, threatened termination during her medical leave, announced return-to-work coaching, and constructively discharged her.

125. Plaintiff's opposition to race discrimination was a but-for cause of Schwab's retaliatory conduct and caused the damages alleged below.

126. Schwab is additionally liable under a cat's-paw theory for retaliation. Kumaraswamy reported accusations about Plaintiff that he later acknowledged were inaccurate. Van Moorleghem directed the opening of the HR consultation, and Conkin participated in the resulting pressure and adverse treatment. Upon information and belief, Kumaraswamy, Conkin, or both provided negative input that was incorporated into Plaintiff's 2024 Annual Performance Review. Those actions contributed to the downgraded review and Plaintiff's constructive discharge, even though another manager formally recorded the rating decision.

## COUNT X — HOSTILE WORK ENVIRONMENT IN VIOLATION OF 42 U.S.C. § 1981

127. Plaintiff realleges and incorporates by reference paragraphs 1 through 84 as though fully set forth herein. Schwab subjected Plaintiff to unwelcome race-based conduct, including unequal treatment, escalated complaints, the HR consultation, threats concerning her continued employment, adverse performance treatment, and pressure involving Kumaraswamy. The conduct affected the terms, conditions, and performance of Plaintiff's employment contract and was sufficiently severe or pervasive to alter those conditions. The racial connection may be inferred from the more favorable treatment of non-Black employees, comparator evidence, Killette's "good old boys club" statement, and the cumulative circumstances alleged above.

128. Plaintiff relies on timely acts within the applicable limitations period. Plaintiff alleges earlier related acts as background and as part of the same continuing course of race-based conduct.

129. Plaintiff's race was a but-for cause of the race-based hostile work environment and the resulting loss of rights under her employment contract. The conduct caused the damages alleged below, including constructive discharge and resulting economic and noneconomic harm.

## VIII. DAMAGES

130. Plaintiff seeks the following damages and relief, to the extent recoverable under applicable law:

a. Back pay and lost compensation from April 1, 2025 (a role paying approximately $146,000 annually, plus bonus and 401(k) match and vesting);

b. Lost employment benefits;

c. Front pay and lost future earnings and career advancement;

d. Compensatory damages for emotional distress, mental anguish, humiliation, inconvenience, and related noneconomic harm, together with recoverable economic and medical damages;

e. Damage to professional reputation and career trajectory;

f. Medical expenses;

g. Punitive damages reflecting Defendant's malice and reckless indifference to Plaintiff's federally protected rights (capped under Title VII and the ADA; uncapped under § 1981);

h. Pre-judgment and post-judgment interest;

i. Attorneys' fees and costs; and

j. All other relief available at law or in equity.

## IX. JURY DEMAND

131. Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury on all issues so triable.

## X. PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully requests that Defendant be cited to appear and answer herein, and that upon final trial, Plaintiff recover judgment against Defendant for: (a) back pay and lost benefits; (b) front pay; (c) compensatory damages under Title VII, the ADA, and § 1981; (d) punitive damages under applicable law; (e) pre-judgment and post-judgment interest at the highest lawful rate; (f) attorneys' fees and costs; (g) equitable relief as appropriate; and (h) such other and further relief to which Plaintiff may be justly entitled.

Respectfully submitted,

Catherine Carter
520 E Vine St #762
Keller, TX 76248
414-517-5928
catherincarter@yahoo.com
Plaintiff, Pro Se
Date: August 10, 2026

Exhibit H

 **U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

**Dallas District Office**
207 S. Houston Street, 3rd Floor
Dallas, TX 75202
(800) 669-4000
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS
(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 05/15/2026

**To:** CATHERINE CARTER
520 E Vine St #762
KELLER, TX 76248

Charge No: 450-2025-02911

EEOC Representative and email:     JACOB RAMIREZ
INVESTIGATOR-BILINGUAL-SPANISH
JACOB.RAMIREZ@EEOC.GOV

## DETERMINATION AND NOTICE OF RIGHTS

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice that the EEOC has dismissed your charge and has issued you notice of your right to sue the respondent(s) on this charge. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of EEOC's official notice of dismissal.** You should keep a record of the date you received the EEOC's official notice of dismissal. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 450-2025-02911.

On behalf of the Commission,

# Jacob Ramirez
Digitally signed by Jacob Ramirez
Date: 2026.05.15 10:22:19 -05'00'

For Travis Nicholson
District Director

JS 44 (Rev. 04/21) (TXND 4/21)

# CIVIL COVER SHEET

4-26CV-981-0

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Carter, Catherine

## DEFENDANTS

Charles Schwab & Co., Inc.

**(b)** County of Residence of First Listed Plaintiff **Tarrant**
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Catherine Carter, Plaintiff, Pro Se, 520 E Vine St #762, Keller, TX 76248, 414-517-5928,

Attorneys *(If Known)*

AUG 10 2026 PM3:07
RECEIVED-USDC-NDTX-FW

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | |
|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | |
| ☐ 2 | U.S. Government Defendant | |
| ☒ 3 | Federal Question *(U.S. Government Not a Party)* | |
| ☐ 4 | Diversity *(Indicate Citizenship of Parties in Item III)* | |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

### CONTRACT
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

### REAL PROPERTY
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

### TORTS
**PERSONAL INJURY**
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury - Medical Malpractice

**PERSONAL INJURY**
- ☐ 365 Personal Injury - Product Liability
- ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

### CIVIL RIGHTS
- ☐ 440 Other Civil Rights
- ☐ 441 Voting
- ☒ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 448 Education

### PRISONER PETITIONS
**Habeas Corpus:**
- ☐ 463 Alien Detainee
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty
**Other:**
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee - Conditions of Confinement

### FORFEITURE/PENALTY
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

### LABOR
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Management Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Retirement Income Security Act

### IMMIGRATION
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

### BANKRUPTCY
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

### INTELLECTUAL PROPERTY RIGHTS
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 835 Patent - Abbreviated New Drug Application
- ☐ 840 Trademark
- ☐ 880 Defend Trade Secrets Act of 2016

### SOCIAL SECURITY
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

### FEDERAL TAX SUITS
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES
- ☐ 375 False Claims Act
- ☐ 376 Qui Tam (31 USC 3729(a))
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit (15 USC 1681 or 1692)
- ☐ 485 Telephone Consumer Protection Act
- ☐ 490 Cable/Sat TV
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Information Act
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Title VII; ADA; 42 U.S.C. § 1981

Brief description of cause:
Employment discrimination, retaliation, hostile work environment, ADA claims, and constructive discharge.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $
As stated in Complaint

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE _____   DOCKET NUMBER _____

DATE 8-10-2026

SIGNATURE OF ATTORNEY OF RECORD *(signature)*

### FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____